ANDREW S. CLARE (SBN 050289)
aclare@loeb.com
MARK D. CAMPBELL (SBN 180528)
mcampbell@loeb.com
LOEB & LOEB LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, California 90067-4120
Telephone:  310-282-2000
Facsimile:  310-282-2200

CHRISTOPHER VAN GUNDY (SBN 152359)
cvangundy@roll.com
SOPHIE N. FROELICH (SBN 213194)
sfroelich@roll.com
ROLL LAW GROUP P.C.
11444 West Olympic Blvd, 10th Floor
Los Angeles, California 90064-1557
Telephone:  310-966-8400
Facsimile:  310-966-8810

TODD C. THEODORA (SBN 120426)
ttheodora@tocounsel.com
THEODORA ORINGHER MILLER & RICHMAN PC
535 Anton Boulevard, 9th Floor
Costa Mesa, California  92626
Telephone:  (714) 549-6200
Facsimile:   (714) 549-6201Attorneys for Plaintiff
POM WONDERFUL LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| POM WONDERFUL LLC,<br><br>              Plaintiff,<br><br>       v.<br><br>WELCH FOODS, INC., et al.,<br><br>              Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. CV-09-00567 AHM (AGRx)<br><br>**PLAINTIFF POM WONDERFUL LLC'S NOTICE OF MOTION AND MOTION FOR NEW TRIAL ON INJURY AND DAMAGES (VERDICT FORM, QUESTION NO. 4) [F.R.C.P. 42, 59]**<br><br>Assigned to Hon. A. Howard Matz<br>Date:    October 25, 2010<br>Time:   10:00 a.m.<br>Place:   Courtroom 14 |

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, on October 25, 2010, at 10:00 a.m., in Courtroom No. 14 of the United States District Court for the Central District of California, Hon. A. Howard Matz, located at 312 N. Spring Street, Los Angeles, CA 90012, Plaintiff Pom Wonderful, LLC ("Pom") will, and hereby does, move for an Order for New Trial on Injury and Damages.

This Motion is made pursuant to Federal Rules of Civil Procedure 42 and 59, and is supported by this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the [Proposed] Order lodged herewith, the declarations of Sophie N. Froelich and Todd C. Theodora, such additional evidence and argument as may be presented at the hearing on this Motion, all of the pleadings, files and records in this proceeding, and such other evidence as may later be submitted.

Dated:  September 23, 2010          ROLL LAW GROUP, P.C.


                                    By:  /s/Todd C. Theodora
                                         Todd C. Theodora
                                         Attorneys for Plaintiff
                                         POM WONDERFUL LLC

818450.1/81024.05002

# Table of Contents

I.     INTRODUCTION ................................................................- 1 -

II.    THE JURY INCORRECTLY CONSIDERED AND DECIDED
       INJURY AND DAMAGES IN PHASE I OF THIS TRIAL ....................- 2 -

       A.    The Court Should Enforce The Understanding The Parties
             Reached On The Record That If Pom Proved Falsity And
             Materiality, Which It Did, Some Injury Would Be
             Presumed, And The Parties Would Move To Phase II, And
             Based On This, The Court Should Set Aside The Jury's
             Answer To Question #4 And Order A New Trial On The
             Amount Of Pom's Damages...........................................- 2 -

       B.    Additionally, The Court Made A Pronouncement That
             Phase I Was Limited To The Issues Of "Falsity" And
             "Materiality," And Based On This, The Court Should Set
             Aside The Jury Verdict And Enter A New Trial On Pom's
             Damages .............................................................- 5 -

       C.    In The Alternative, In The Event The Court Does Not
             Follow Its Pronouncement Or The Understanding Reached
             Between The Parties, The Court Should Set Aside The
             Jury's Answer To Question #4 And Order A Phase II Trial
             To Determine Whether Pom Was Damaged And, If So,
             The Amount Of Pom's Damages ....................................- 6 -

             1.    Pom's Offer Of Proof:  Pom Would Have Proven
                   Injury And Damages Through Vanessa Hill's And
                   Matt Tupper's Testimony If It Had Been Given The
                   Opportunity ................................................- 6 -

             2.    The Only Way To Prove That Pom Lost Sales
                   And/Or Goodwill To Welch's Is By Proving Up
                   Welch's Wrongly Garnered Sales By Ounces – And
                   Expert Testimony Quantifying Pom's Damages .................- 10 -

             3.    Pom's Reasonable And Good Faith Belief That
                   Phase I Was Limited To "Falsity" And
                   "Materiality" Was Reinforced During Trial ....................- 10 -

             4.    Over Pom's Objections, The Question Of Injury
                   Was Submitted To The Jury In Phase I...........................- 12 -

III.   BECAUSE THE TRIAL WAS BIFURCATED AND
       QUESTION 4 WAS SUBMITTED TO THE JURY, POM WAS
       DENIED A FAIR TRIAL ON THE ISSUE OF INJURY AND
       DAMAGES, AND THE COURT SHOULD RE-OPEN THE
       TRIAL ON THESE ISSUES ALONE ....................................- 14 -

       A.    A. Legal Standards ..................................................- 15 -

1.      1. The Court Has The Power To Order A Partial New Trial On Injury And Damages To Prevent Injustice ........................................................................- 15 -

2.      2. Bifurcation Is Proper Only When It Does Not Result In Prejudice To A Party, And An Erroneous Ruling On Bifurcation Can Be Grounds For A New Trial ...........................................................................- 16 -

B.    B. Because Question 4 Was Submitted To The Jury In Phase I, Bifurcation Was Improper And Prejudicial To Pom, And A New Trial On Injury And Damages Is Warranted .....................................................................- 18 -

IV.   CONCLUSION ..............................................................- 20 -

818450.1/81024.05002

PLAINTIFF'S MOTION
FOR NEW TRIAL ON
INJURY AND DAMAGES

## Cases

A.A. Poultry Farms Inc. v. Rose Acre Farms, Inc.,
     683 F.Supp. 680, 683-685, 696 (S.D. Ind. 1988) ...................................... 17, 20

Bard Peripheral Vascular Inc. v. W.L. Gore & Assocs., Inc.
     2007 WL 3208540, *1 (D. Ariz. 2007) ...................................... 16

Gill v. Rollins Protective Svcs. Co.
     773 F.2d 592, 594 (4th Cir. 1985) ...................................... 16

Hamm v. American Home Products Corp., ...................................... 17

Hamm v. American Home Products Corp.,
     888 F.Supp. 1037, 1039 (E.D. Ca. 1995) ...................................... 17

Keyes Fibre Co. v. Packaging Corp. of America
     763 F.Supp. 374, 375-376 (N.D. Ill. 1991) .............................. 17, 20

Pryer v. C.O. Slavic
     251 F.3d 448, 454-455 (3d Cir. 2001) ...................................... 15

THK America, Inc. v. Nippon Seiko K.K.
     141 F.R.D. 463, 464, 465 (N.D. Ill. 1991) .............................. 16, 19

Westefer v. Snyder
     2010 WL 331733, * 1 (S.D. Ill. 2010) ...................................... 16

Wharf v. Burlington Northern Railroad Company
     60 F.3d 631, 638 (9th Cir. 1995) ...................................... 15

818450.1/81024.05002

PLAINTIFF'S MOTION
FOR NEW TRIAL ON
INJURY AND DAMAGES

**<u>Rules</u>**

Rule 59 Fed. R. Civ. Pro. 59(a) of the Federal Rules of Civil Procedure ............ - 15

Fed. R. Civ. Pro. 59(a) ......................................................................... - 15

818450.1/81024.05002

PLAINTIFF'S MOTION
FOR NEW TRIAL ON
INJURY AND DAMAGES

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiff Pom Wonderful LLC ("Pom") requests that the Court order a new trial on the issue of Pom's damages because it was not given a full and fair trial on that issue.[1] At the conclusion of Phase I of the trial, the Court erroneously included Question #4 on the Verdict Form that required Pom to prove it lost sales as a result of Welch Food, Inc.'s ("Welch's") deception.  However, at the Pretrial Conference where the Court ordered the case bifurcated, the parties reached an understanding on the record that if Pom proved falsity and materiality, it would be presumed for Phase I that Pom had been damaged in some unspecified amount.  The parties would then proceed to Phase II and determine the amount of Pom's damages.  Beyond this, in ordering bifurcation the Court made its own pronouncement that Phase I would be limited to "falsity and materiality" and that "any evidence about damages" would be reserved for Phase II.  Given this, it was reasonable for Pom to believe that Phase I would be so limited and it would not have to prove lost sales.

However, if the Court does not see fit to order a trial on just the amount of Pom's damages, the Court should, at a minimum, order that there be a Phase II trial to determine whether Pom was damaged and, if so, the amount of its damages.  The Court should do so because Pom did not receive a fair trial for the following reasons:

- • Given the Court's pronouncement and Pom's reasonable belief about the parties understanding reached on the record, Pom specifically did not present its key damages testimony in Phase I.  Pom would have

---

[1]  Together with this brief, Pom has filed a formal Objection to the Proposed Judgment and an additional brief concerning its right to equitable relief in this case. As more fully explained in the additional brief, Pom respectfully is entitled to a hearing on its request for equitable relief, such as an injunction against this product, an order to Welch's to pull the remaining product from the shelves, etc.

PLAINTIFF'S MOTION
FOR NEW TRIAL ON
INJURY AND DAMAGES

questioned its President, Matt Tupper, extensively on this topic and called its damages expert, Vanessa Hill.  In Section II.C.1 below, Pom offers a proffer of what that evidence would have been.

- The primary way for Pom to establish that it had lost sales was to emphasize Welch's actual sales, a substantial portion of which were generated by people who would never have bought the Welch's product had they know the truth about it.  It was not possible for Pom to prove fully that it was damaged without presenting full and complete evidence of Welch's actual sales, etc., which was a Phase II issue.

- Pom's belief that evidence of injury and damages would be introduced only in Phase II if it proved "falsity" and "materiality" was reinforced during the trial when, for example, during the cross examination of Karen Mitchell, Welch's vice president of marketing, the Court stated that evidence of Welch's profit on its White Grape Pomegranate Juice product was an issue for Phase II.

- Despite Pom's objection and motion to reopen its case for the limited purpose of establishing lost sales, the Court submitted Question #4 to the jury.

Pom does not deny that it must prove injury in the form of lost sales or goodwill to recover damages from Welch's.  But submission of Question 4 to the jury in Phase I—instead of in Phase II—deprived Pom of a fair trial.

## II.     THE JURY INCORRECTLY CONSIDERED AND DECIDED INJURY AND DAMAGES IN PHASE I OF THIS TRIAL

### A.     The Court Should Enforce The Understanding The Parties Reached On The Record That If Pom Proved Falsity And Materiality, Which It Did, Some Injury Would Be Presumed, And The Parties Would Move To Phase II, And Based On This, The Court Should Set Aside The Jury's Answer To Question #4 And Order A New Trial On The Amount Of Pom's Damages

It is Pom's belief that during the Pretrial Conference the parties reached an agreement on the record that if Pom proved falsity and materiality "that the element of injury would thereby be inherently established without further need in the first phase to quantify it through evidence of damages."  Pre-Trial Conference Transcript

("PTr."), 8/31/10, at 68:10-20, Ex. B, Froelich Decl.  This should have eliminated the need for Question #4 on the Verdict Form.  Since the jury found both falsity and materiality, the Court should set aside the jury's answer to Question #4 and order a new trial on the amount of Pom's damages.

The following colloquy between the Court and the parties' counsel formed the basis of Pom's belief that there was an understanding that if Pom proved falsity and materiality that some amount of damage to Pom would be presumed and the trial would move to Phase II:

THE COURT:  Now, on Page 3 of the pre-trial order, we'll see what happens on the jury verdict on the Special Verdict Form as to liability, and we are going to have to work very hard to make very good, clear questions that address whether or not they establish *falsity and materiality*.  And my inclination right now is to limit the first phase of the trial to ***that issue of liability*** and have ***any*** *evidence about damages* reserved for a second phase to see whether we get that far.

* * * * *

Now I know that in the liability phase, Pom is going to say evidence about damage is relevant for purposes of proving willfulness, and we have to determine in the first phase whether a jury found that what Pom did was not only misleading but was done willfully.

That would be your position, right?

MR. THEODORA:  Yes.

THE COURT:  Okay.  But I don't think that position has a lot of merit if it means that there's an open field for you to get into all these issues that I am trying to avoid taking up jury time and court time that relate to dollars and cents.

It seems to me that the evidence of willfulness is available and it will be plenty sufficient if you establish – which it should be easy to establish that

PLAINTIFF'S MOTION
FOR NEW TRIAL ON
INJURY AND DAMAGES

1

2   Welch wanted to make a lot of money off of this without knowing exactly

3   how much it made.

4          * * * * *

5          So I don't think what my contemplation is about bifurcation is

6   inconsistent with your desire to prove willfulness, so that's how I see this

7   case.

8          And in the second phase, after the jury retires to determine what, if any

9   damages are compensable and to be awarded, if there's some slice of this –

10  and I think it would be very narrow – that really wasn't for the jury or that

11  couldn't be put on it the presence of the jury with an advisory finding, then I

12  can hear that in what would be numerically looked at as the third phase,

13  meaning disgorgement.

14         Anybody wish to be heard on that concept?

15         Okay. That's how we are going to do it, then.

16  PTr. at 66:4-67:18, Ex. B, Froelich Decl. (emphasis added).

17         Next, Pom's counsel sought clarification of the Court's bifurcation order and

18  in particular whether Pom needed to present evidence and prove it lost sales in

19  Phase I, to which the Court responded that such evidence was unnecessary and the

20  parties should instead entered into a stipulation that at least some injury occurred if

21  there was deception:

22         MR. THEODORA:  Well, I just need a few points of clarification on

23         that and wanted to have a firmer idea of what these phases would look like.

24         *So we are talking about a liability phase where we go through is the label*

25         *deceptive – correct?*

26         THE COURT:  *Yes.*

27         MR. THEODORA:  Okay.

28         *-- and did people buy the product thinking it was one thing when it's*
           *another thing, materiality?*

- 4 -

818450.1/81024.05002

Would we also have to prove that we lost sales as a result of this during the first phase or are we just focusing on whether the label was deceptive? Because I can see having a streamlined case on whether the label was deceptive and whether it was willful and then trying whether Pom lost money and whether Welch's made money in a separate trial.  I can see the logic of that and would support it....

THE COURT:  Well, in my desire to – and you raised a valid question. And it seems to me – before I hear from you Mr. Shackelford – that there ought not to be any barrier to a very carefully phrased stipulation that the parties can enter into without it necessarily being read to or anything said about it to the jury, that if *falsity and materiality* in terms of the purchasing decision and impact in terms of a substantial segment of the audience are proven, Welch would stipulate that to some unspecified extent, the element of injury would thereby be inherently established without further need in the first phase to quantify it through evidence of damages.

PTr. at 67:19-68:20; Ex. B, Froelich Decl. (emphasis added).

Welch's statement on the record that "I don't know that we would have any basis to dispute [the stipulation]" and that the stipulation "make[s] some sense" gave rise to Pom's belief that Phase I would be limited to "falsity" and "materiality." PTr. at 69:20-70:4; Ex. B, Froelich Decl.  Welch's should be bound by this.

**B.    Additionally, The Court Made A Pronouncement That Phase I Was Limited To The Issues Of "Falsity" And "Materiality," And Based On This, The Court Should Set Aside The Jury Verdict And Enter A New Trial On Pom's Damages**

Even if the Court does not believe that the parties reached an understanding on the record regarding the scope of Phase I, the Court's bifurcation order still stands and its pronouncement bears repeating:

[W]e are going to have to work very hard to make very good, clear questions that address whether or not they establish *falsity and materiality*.  And my inclination right now is to limit the first phase of the trial to ***that issue of liability*** and have ***any evidence about damages*** reserved for a second phase to see whether we get that far.

PTr. at 66:2-7; Ex. B, Froelich Decl. (emphasis added).  The Court's bifurcation order was not premised on the parties reaching any agreement and stands as a separate and distinct basis for Pom's reasonable belief that Phase I would be limited to "falsity" and "materiality."

### C.   In The Alternative, In The Event The Court Does Not Follow Its Pronouncement Or The Understanding Reached Between The Parties, The Court Should Set Aside The Jury's Answer To Question #4 And Order A Phase II Trial To Determine Whether Pom Was Damaged And, If So, The Amount Of Pom's Damages

The Court should set aside the jury's answer to Question #4 and order a Phase II trial because for all of the following reasons, Pom was deprived a full and fair trial on damages.

### 1.   <u>Pom's Offer Of Proof</u>:  Pom Would Have Proven Injury And Damages Through Vanessa Hill's And Matt Tupper's Testimony If It Had Been Given The Opportunity

If Pom had been given the opportunity to reopen its case or had been advised by the Court that it had to prove lost sales or goodwill during Phase I, Pom would have questioned Mr. Tupper extensively on this topic and called its damages expert, Vanessa Hill.  With respect to Mr. Tupper, he would have testified as follows:

- An explanation of why the allocation did not affect Pom's sales:  The allocation ended on January 1, 2007, Pom did not lose any customers as a result, and Welch's product was introduced in July, 2007 – after the allocation was over;
- Pom's and Welch's market share in the juice industry;

- 6 -

- Where Pom's products and Welch's Juice are sold throughout the United States, broken down by type of store in each region (e.g., at Costco, or in the retail channel), and where both parties' products were sold in the same stores, at the same time;

- An explanation of how surveys are used generally to extrapolate and make assumptions about the general population's juice drinking habits;

- The interpretation of Dr. Cole's survey, in relation to lost Pom sales, based upon Mr. Tupper's years of experience in utilizing consumer surveys to grow Pom's business;

- Using evidence provided by Vanessa Hill, Pom's damages expert, how many people actually drank Welch's Juice, per year;

- His experience in juice sales and consumer buying patterns, which would have explained certain inherent assumptions in Ms. Hill's report. For example, Mr. Tupper would have testified that Pom's 100% Pomegranate Juice Product is Pom's most popular SKU; its 48 oz bottle is its biggest seller; and he would have shown how these facts and the historic buying patterns of Pom's customers relate to lost sales by Pom;

- That Dr. Cole's and Ms. Hill's testimony concerning the number of people that would have bought Pom's product instead had they known the truth about the Welch's product dovetails with Mr. Tupper's determination that Pom never captured its fair share of the increasing number of pomegranate juice drinkers since the inception of the Welch's product; and

- Pom's loss of goodwill in that Welch's product, label or packaging misinformed consumers as to the true price of pomegranate juice blends with significant amount of pomegranate juice such that consumers erroneously would believe that Pom's juice products were

PLAINTIFF'S MOTION
FOR NEW TRIAL ON
INJURY AND DAMAGES

unreasonably overpriced, and explain how this fact would relate to lost sales or sales opportunities.

Theodora Decl., ¶ 11

Additionally, Pom's damages expert, Vanessa Hill, would have offered testimony that tied Mr. Tupper's and Dr. Cole's testimony together, and showed that Pom was injured by Welch's deception to the tune of $5.6 million:

- How many cases of Welch's Juice were sold per year;
- The volume of Welch's sales stemming from people who would not have bought Welch's product had they known the truth about it;
- The percentage of Welch's drinkers who would have bought Pom's product instead;
- The amount of Pom's product that these Welch's drinkers would have bought, but did not buy because they were buying Welch's believing that it contained substantial amounts of pomegranate juice when it did not;
- The amount of sales Pom lost to Welch's per year;
- Therefore, one cannot discuss whether Pom was damaged without delving fully into the foregoing, including a complete discussion of Welch's sales and the percentage of Welch's drinkers who would have bought Pom had they known the truth about Welch's product;
- Pom did not obtain certain sales because its customers bought Welch's cheaper, intentionally mislabeled Juice instead, and so Pom, which marketed its products fairly and at a higher price, lost profits on those sales. There is a percentage of Pom's lost sales from customers who would have otherwise purchased Pom, but were deceived into thinking that Welch's 100% Juice White Grape Pomegranate product had a substantial amount of pomegranate juice in it, and bought Welch's instead;

PLAINTIFF'S MOTION
FOR NEW TRIAL ON
INJURY AND DAMAGES

- Even given the allocation, Pom had enough product to sell to the Welch's drinkers who would have bought Pom's product had they known the truth about the Welch's product;

- Pom lost goodwill because Welch's created the false impression that one can buy substantial amounts of pomegranate juice for a low price, suggesting that Pom's products were overpriced. This unfair perception that Pom's products were overpriced made its products unattractive to certain consumers;

- How the success of Welch's Juice reinforces the fact that Pom lost sales;

- Survey evidence that shows Welch's drinkers also purchased Pom, and why that is important: The companies shared customers and customers substituted one product for another; and

- How Pom was injured overall – how the survey evidence put forth by Drs. Cole and Jay can be translated into actual lost sales, and how this evidence concerning consumer behavior actually demonstrates sales of Welch's Juice that Pom would have otherwise obtained.

Theodora Decl., ¶ 10.

In summary, if Pom had been permitted to offer additional testimony of Mr. Tupper and to call Ms. Hill in Phase I of the trial, Pom would have established that it lost sales, and was therefore injured. This testimony was essential and the expected result is not speculation on Pom's part. Theodora Decl., ¶ 12. Indeed, after the jury was discharged, Pom spoke with the jury foreperson (Juror No. 4), who stated that he answered "no" to Question 4 on the Verdict Form because Pom did not offer specific evidence of its lost sales. Froelich Decl., ¶ 7. Importantly, this juror also stated that there was no question that Welch's competed with Pom, and that Pom's products were in competition with Welch's juice. Id.

818450.1/81024.05002

**2.     The Only Way To Prove That Pom Lost Sales And/Or Goodwill To Welch's Is By Proving Up Welch's Wrongly Garnered Sales By Ounces – And Expert Testimony Quantifying Pom's Damages**

As noted, the main way for Pom to establish that it had any lost sales was to emphasize Welch's actual sales, a substantial portion of which were generated by people who would never have bought the Welch's product had they know the truth about it.  In layman's terms, you cannot "unscramble an omelet."  In other words, it was not possible for Pom to prove fully that it was damaged without presenting full and complete evidence beginning with Welch's actual sales.  Evidence of Pom's injury, that is, its lost sales and loss of goodwill, is very difficult, if not impossible, to separate, from its expert damage analysis that would have been provided by Ms. Hill.

This is because the only way to prove Pom directly lost sales to Welch's is to show how much of the Juice Welch's sold generally; how much of the Welch's sales went to people who were tricked into believing that the product had a substantial amount of pomegranate juice in it; how much of those sales were to persons who would have bought Pom; and then, to quantify Pom's lost sales.  Theodora Decl., ¶ 12.  As set forth above, this would have been the subject of Mr. Tupper's Phase II testimony, and Ms. Hill's Phase II expert testimony.  Theodora Decl., ¶¶ 10,11.

**3.     Pom's Reasonable And Good Faith Belief That Phase I Was Limited To "Falsity" And "Materiality" Was Reinforced During Trial**

Pom's belief that evidence of injury and damages would be introduced only in Phase II if it proved that Welch's label, packaging or advertising intentionally misled a substantial amount of consumers was reinforced during the trial.   Theodora Decl., ¶ 4.  For example, during the cross examination of Karen Mitchell, Welch's vice president of marketing, Mr. Theodora began questioning Ms. Mitchell about critical injury and damages information—the profit Welch's made on every case of

- 10 -

818450.1/81024.05002

Welch's White Grape Pomegranate Juice sold—but was reminded by the judge that this kind of testimony was for Phase II:

        Q (MR. THEODORA):  And "PC" stands for profit contribution, correct?

        A (MS. MITCHELL):  Yes.

        Q:  And the way you get to that number is you start with a net selling price of 22.97 to the customer, correct?

        A:  Yep.

        Q:  And you subtract from that all of the expenses that are listed in the column, correct?

        A:  That is – yep.

        Q:  So 51.41 percent of profit contribution means that for every case sold for 22.97, Welch's expects to make a profit of 51.41 percent of that figure, correct?

        A:  Before we take out trade spending and other spending.  But that's the gross margin, yes.

        Q:  Right.  And that comes out to $11.81 per item, correct?

        A:  Yep.

        Q:  And that's referred to in the industry as a top-line profit, right?

        A:  I actually haven't heard that term.  Gross margin is what we usually call it.

        Q:  All right. And then –

        THE COURT:  You know, I want to be fair to both sides, given the time limits I set [on testimony].  Isn't this about Phase 2, what you're going into now?

        MR. THEODORA:  It is, Your Honor –

        THE COURT:  That's –

        MR. THEODORA:  -- but it was brought up before, but –

PLAINTIFF'S MOTION
FOR NEW TRIAL ON
INJURY AND DAMAGES

818450.1/81024.05002

1

2   THE COURT:  It's coming against your allocated time, so I just want to

3   let you choose how to use it.

4   MR. THEODORA:  Thank you, Your Honor.

5   Ex. F, Froelich Decl., 626:10-627:17.

6   This comment from the Court confirmed Pom's understanding that the entire

7   topic of damages was reserved for Phase II.  After this exchange, Mr. Theodora

8   moved on to other subjects, the refrigerated version of Welch's White Grape

9   Pomegranate Juice and juice sales generally, because he believed this critical part of

10  injury and damages testimony, Welch's profits from the White Grape Pomegranate

11  Juice, would be the focus of Phase II of the trial.  Ex. F, Froelich Decl., Tr. at

12  627:24-628:16; Theodora Decl., ¶ 4.  Indeed, as explained above, Pom could not

13  prove injury or damages without further developing this exact testimony.  Theodora

14  Decl., ¶12.

15
16  **4.   Over Pom's Objections, The Question Of Injury Was Submitted To The Jury In Phase I**

17  The final Verdict Form, prepared by the Court and seen for the first time by

18  the parties' attorneys only hours before closing argument, asked the jury (in

19  Question 4) whether Pom proved "by a preponderance of the evidence that it

20  suffered injury, consisting of lost sales or lessening of goodwill <u>as a result of</u>"

21  Welch's conduct?  Froelich Decl., ¶6 (emphasis added).  Mr. Theodora objected to

22  Question 4, and in the alternative, requested that the Court reopen its case against

23  Welch's to put in evidence of injury:

24  MR. THEODORA:  We have no concerns about [Verdict Form

25  Questions] 1, 2, or 3, but on the fourth item, Your Honor, we thought it was

26  very clear at the outset of this case that this bifurcated trial was just to involve

27  Points 1, 2, and 3 and that Number 4 of Pom Wonderful's injury was going to

28  be tried in the second phase of the case, along with the damages.

PLAINTIFF'S MOTION
FOR NEW TRIAL ON
INJURY AND DAMAGES

818450.1/81024.05002

In other words, it refers to lost sales, and I believe the Curt instructed the jury at the beginning of the case that we were just going to go through these first three items.

And I, believing that this was a subject for the next phase, did not put on any evidence of our lessening of our goodwill or of our lost sales.  In particular, when Mr. Tupper was on the – I intend to use Mr. Tupper in the next phase to go into all this as to how Pom Wonderful was injured by this. It certainly was touched upon briefly during this phase of the trial, because I had objected – I saw Mr. Shackelford was going to go into that subject in his opening statement and I objected to it and said it wasn't relevant.

It came in, so because it came in, I provided some evidence on it, but I did not try this case believing that I had to show lost sales or lessening of goodwill. I've saved all that for the next phase.

So we would ask the court to just limit this to Points [Verdict Form Questions] 1, 2, and 3, which was my understanding at the beginning of the case and the way I conducted myself through it.

9/10/10 Tr. at 897:17-898:17, Ex. G, Froelich Decl. ¶ 11.

* * * * *

MR. THEODORA: … And I didn't put any evidence – I mean, again, I didn't know specifically that this is what we were going to focus on, so I didn't get into this with Mr. Tupper.

I really would be remiss – I hope the Court does not take this the wrong way – if I didn't move to reopen to put Mr. Tupper on to address this particular item.

9/10/10 Tr. at 908:14-19, Ex. G, Froelich Decl.

Both Mr. Theodora's objection to Question 4 of the Verdict Form and his request to reopen the trial to address injury via Mr. Tupper's additional testimony were denied by the Court.  Tr. at 908:21-25, Ex. G, Froelich Decl.

PLAINTIFF'S MOTION
FOR NEW TRIAL ON
INJURY AND DAMAGES

818450.1/81024.05002

In part, the Court explained that Question 4 was included in the Verdict Form because it was a "statutory element" and that Pom had no basis to be "surprised" about the inclusion of the Question "in the basic instruction to the jury on liability." Ex. G, Froelich Decl., Tr. at 899:16-19. As set forth in this brief, this position fails to address the prejudice Pom suffered from the undue surprise that it should have adduced in Phase I all of its actual injury evidence (which it did not). Moreover, it should be noted that declaring "actual injury" an element of a Lanham Act claim does not address the fact that reserving the actual injury question for Phase II would not have prejudiced any party, would not have increased the time of trial, but in fact would have obviated the prejudice to Pom. But unfortunately, that did not happen here; and Pom was prejudiced.

For the above reasons, Pom was denied a full and fair trial on damages.

**III.   BECAUSE THE TRIAL WAS BIFURCATED AND QUESTION 4 WAS SUBMITTED TO THE JURY, POM WAS DENIED A FAIR TRIAL ON THE ISSUE OF INJURY AND DAMAGES, AND THE COURT SHOULD RE-OPEN THE TRIAL ON THESE ISSUES ALONE**

In this case, a new trial on the issue of injury and damages is warranted because Question 4 necessarily blurred the evidentiary line between liability, injury and damages. Because of this, bifurcation was improper, and highly prejudicial to Pom.

To cure this prejudice, either Question 4 should have been withdrawn from jury consideration, or Pom should have been allowed to briefly reopen the trial on the issue of injury (to address lost sales and goodwill). The Court did not allow either of these options; and so a new trial on injury and damages is warranted. Pom's reasoning is set forth below.

**A.   Legal Standards**

**1.   The Court Has The Power To Order A Partial New Trial On Injury And Damages To Prevent Injustice**

PLAINTIFF'S MOTION
FOR NEW TRIAL ON
INJURY AND DAMAGES

818450.1/81024.05002

Rule 59 of the Federal Rules of Civil Procedure grants the court authority to order a new trial on all or some of the issues in a case. Fed. R. Civ. Pro. 59(a). Partial new trials are proper when it "clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice. Consistent with these principles, a new trial limited solely to damages is improper where the question of damages is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to a denial of a fair trial." Pryer v. C.O. Slavic, 251 F.3d 448, 454-455 (3d Cir. 2001) (emphasis added)(issues so intertwined, new trial in liability and damages was necessary). Conversely, a partial new trial on damages is appropriate where the "error" "requiring a new trial" relates "peculiarly to the damages portion of the trial only, and" does "not implicate the jury's liability verdict." Pryer, supra, 251 F.3d at 455; see, also Wharf v. Burlington Northern Railroad Company, 60 F.3d 631, 638 (9th Cir. 1995) (vacating damages award and remanding for new trial on issue of damages alone, where no "injustice" would result), Jones, et al., Federal Civil Trials and Evidence, Ch. 20, ¶ 20:91.1 (TRG 2010) ("A partial new trial solely on damages may be ordered so long as it does not involve a tangled or complex fact situation that makes it unfair to determine damages apart from liability.") (emphasis added).

Rule 59 does not enumerate standards for when a new trial should be granted. Instead, "the decision whether to grant a motion for a new trial is [ultimately] within a trial court's discretion." Westefer v. Snyder, 2010 WL 331733, * 1 (S.D. Ill. 2010) (internal citations omitted). However, the "court has the power and duty to order a new trail whenever, in its judgment, this action is required in order to prevent injustice." Id. If the "verdict is against the clear weight of the evidence," or is based upon "evidence which ... will result in a miscarriage of justice," a new trial will be granted. Gill v. Rollins Protective Svcs. Co., 773 F.2d 592, 594 (4th Cir. 1985) (internal citations omitted).

818450.1/81024.05002

### 2. Bifurcation Is Proper Only When It Does Not Result In Prejudice To A Party, And An Erroneous Ruling On Bifurcation Can Be Grounds For A New Trial

"In determining whether to try issues separately, the district court is vested with discretion.  Notwithstanding this discretion, a judge should *not routinely* order separate trials," and separate trials are "*not the usual course* that should be followed."  THK America, Inc. v. Nippon Seiko K.K., 141 F.R.D. 463, 464 (N.D. Ill. 1991) (emphasis supplied).  For example, "courts should not order separate trials when bifurcation would result in unnecessary delay, additional expense, or some other form of prejudice."  Bard Peripheral Vascular Inc. v. W.L. Gore & Assocs., Inc., 2007 WL 3208540, *1 (D. Ariz. 2007) ("The Court must balance two types of competing prejudice:  confusion of a jury on complicated issues if bifurcation is denied; second, prejudice caused by the considerable delay that will result if separate trials … [are] ordered").  Similarly, courts will decline to order separate trials when "certain evidence" such as willfulness, "is relevant to both liability and damages."  THK America, supra, 141 F.R.D. at 465 (declining to order separate trials in patent infringement case, because the action involved a willful infringement charge and in "such a circumstances the damages jury must hear the evidence on liability as well as damages"), citing Keyes Fibre Co. v. Packaging Corp. of America, 763 F.Supp. 374, 375-376 (N.D. Ill. 1991) (declining to bifurcate trial on issue of liability and damages, because the facts establishing liability and damages overlapped and it would be more economical, and less prejudicial, to conduct one trial).  And, in Hamm v. American Home Products Corp., the court declined to bifurcate the issue of the defendant's wealth from a product liability action, despite the risk of prejudice to the defendant, in part because any prejudice could be cured with a limiting instruction, and to avoid the "subtle incentive for the jury to return a verdict for the defendants" if it knows, from the "outset," that "there will be further

818450.1/81024.05002

proceedings in the event of a [liability] verdict for the plaintiff." 888 F.Supp. 1037, 1039 (E.D. Ca. 1995).

Consistent with these principles, an erroneous ruling on bifurcation can be grounds for a new trial. In <u>A.A. Poultry Farms Inc. v. Rose Acre Farms, Inc.</u>, an egg processor brought an antitrust action against an integrated egg processor/producer, alleging that the defendant engaged in illegal price discrimination or "predatory pricing" by targeting plaintiffs' customers and selling eggs at special prices in order to induce plaintiffs' customers to buy eggs from the defendant instead of the plaintiffs. 683 F.Supp. 680, 683-685 (S.D. Ind. 1988). The defendants counterclaimed, alleging that the plaintiffs conspired with each other to force the defendant to abandon its legitimate competitive conduct; and that when the defendant refused to join the conspiracy, plaintiffs filed their lawsuit to harass the defendant. <u>Id.</u>, at 692. The counterclaims were bifurcated from the plaintiffs' claims and not tried to the jury with the plaintiffs' claims. Following a jury trial, the court granted the defendants' motion for judgment notwithstanding the verdict (which had been in favor of plaintiffs) and reversed its own ruling originally bifurcating the claims from counterclaims:

> Rose Acre's counterclaim alleged that the plaintiffs brought their ... action to force Rose Acre to stop its competitive pricing practices and to make it more difficult for Rose Acre to expand its business. Rose Acre contends that because the plaintiffs had an improper purpose for bringing the action, the litigation is baseless and would be a "sham" within the meaning of the <u>Noerr-Penington</u> doctrine. ... The <u>Noerr-Pennington</u> doctrine has been developed by the courts .... To [prevent] the very type of injury which Rose Acre has alleged. **Because the Court granted plaintiff's motion for bifurcation, Rose Acre was precluded from offering any evidence of the plaintiffs' own pricing practices and any evidence of alleged price discussions between plaintiffs aimed at maintaining egg prices at a certain level. The exclusion of this evidence resulted in the jury receiving an incomplete view of the shell egg industry. ... The defendant was severely prejudiced by the one-sided picture** of Rose Acre's use of special[] pricing during the relevant period without the consideration of any use of special[] [pricing] by the plaintiffs or as a practice generally in the industry. <u>Id.</u> at 696 (emphasis added).

818450.1/81024.05002

Thus, if bifurcation results in the exclusion of evidence that prevents a jury from seeing both sides of a critical issue, and results in prejudice to a party, bifurcation can give rise to a new trial.

**B.    Because Question 4 Was Submitted To The Jury In Phase I, Bifurcation Was Improper And Prejudicial To Pom, And A New Trial On Injury And Damages Is Warranted**

Applying the foregoing standards here, it is clear that the trial should never have been bifurcated, and that, under the circumstances, Pom suffered substantial prejudice.[2]

First, due to the way the case unfolded, bifurcation was improper. As originally contemplated by the Court's bifurcation order, evidence of Welch's intent or willful deception would have been separated from proof of injury and damages. Ex. B, Froelich Decl. Tr. At 66;4-67:18.  Under these circumstances, bifurcation would have been proper.  Evidence of Welch's willful, intentional consumer deception would have been cleanly separated from the evidence of injury and damages.

However, because Question 4 was submitted to the jury, Pom suddenly had to prove not only willfulness in Phase I, but also injury "consisting of <u>lost sales</u> or <u>lessening of goodwill</u> <u>as a result of</u> Defendant's conduct."  Froelich Decl., Ex. A Verdict Form, Question 4 (emphasis added).  That is, Question 4 of the Verdict form inextricably linked the concept of injury (lost sales and goodwill) to evidence of willfulness and materiality.  Linking willfulness and materiality evidence with damages evidence in Phase I required full-blown Phase II evidence of damages from Vanessa Hill and Mr. Tupper.[3]  Put differently, under "such circumstances the …

---

[2]  Importantly, bifurcation generally, and bifurcation of actual injury from quantification of damages is not driven by any substantive legal principle.  And, no party even moved for bifurcation formally; the Court ordered it <u>sua</u> <u>sponte</u>.

[3]  As set forth above in more detail, Ms. Hill would have testified (among other things) as to the amount of sales Pom lost to Welch's; Pom's lost goodwill; and she

PLAINTIFF'S MOTION
FOR NEW TRIAL ON
INJURY AND DAMAGES

jury … [would have to] hear the evidence on liability as well as damages," because the evidence of damages, injury and willfulness were no longer separated as the Court contemplated. THK America, supra, 141 F.R.D. at 465. In "such a circumstances the damages jury must hear the evidence on liability as well as damages," and bifurcation is improper. Id.

Second, Pom was prejudiced by the inclusion of Question 4 in Phase I of this bifurcated trial. When the Court first determined that this case should be bifurcated, there was no risk of prejudice to Pom, or any risk that evidence from Phase I and Phase II would overlap. This is because the Court specifically contemplated that Phase I would be limited to "falsity" and "materiality" and that some injury would be presumed if Pom proved deception. 8/31/10, PTr. at 65:25-70:7; Ex. B, Froelich Decl. Question 4, therefore, should either have been withdrawn or Pom should have been allowed to re-open the case on injury and damages.

Ultimately, neither of these things happened and Question 4 was submitted to the jury. Froelich Decl., ¶ 6. Mr. Theodora objected, because it was difficult, if not impossible, for Pom to prove lost sales and lost goodwill at this point: Neither Mr. Tupper nor Ms. Hill had testified concerning lost sales and/or lost goodwill, and so the jury had no opportunity to consider Pom's most important, and most convincing

---

would have explained how Pom was injured overall – how the survey evidence put forth by Drs. Cole and Jay can be translated into actual lost sales, and how this evidence concerning consumer behavior actually demonstrates sales of Welch's Juice that Pom would have otherwise obtained. Theodora Decl., ¶ 10. Then, Mr. Tupper would have built on this testimony, and explained to the jury key points, including his interpretation of Dr. Cole's survey, how it shows that Welch's intentionally targeted the same kind of customers that Pom targeted (those interested in health benefits of pomegranates), and how it relates to Pom's lost sales, as well as certain inherent assumptions in Ms. Hill's report that impact juice sales and consumer buying patterns. For example, Mr. Tupper would have testified that Pom's 100% Pomegranate Juice Product is Pom's most popular SKU; its 48 oz bottle is its biggest seller; and he will show how these facts and the historic buying patterns of Pom's customers relate to lost sales by Pom. Theodora Decl., ¶ 11.

PLAINTIFF'S MOTION FOR NEW TRIAL ON INJURY AND DAMAGES

818450.1/81024.05002

evidence of injury.  Theodora Decl., ¶ 5.  As a result, the jury had an incomplete picture of injury and damages and willfulness, and how lost sales, lost goodwill, and Welch's intentional deception of consumers fit together to damage Pom.  Direct evidence of lost sales, and the impact of Welch's willful, intentional deception on Pom's lost sales, could come only through Mr. Tupper and Ms. Hill, during Phase II of the trial.  Theodora Decl., ¶ 12.  This testimony was not only essential to Pom's injury case, but, as the jury foreperson noted, it would have made a difference here.  Froelich Decl., ¶ 7.  Under these circumstances, bifurcation is prejudicial error, and it should not have occurred.  AA Poultry Farms, 683 F. Supp. At 696; see also, THK America, supra, 14 F.R.D. at 465; Keyes Fibre Co., 763 F. Supp. At 376-376.

## IV.    CONCLUSION

For the reasons set forth above, Pom's Motion should be granted.

Dated:  September 23, 2010          ROLL LAW GROUP P.C.


By: /s/  Todd C. Theodora
     Todd C. Theodora
     Attorneys for Plaintiff
     POM WONDERFUL LLC

818450.1/81024.05002

PLAINTIFF'S MOTION
FOR NEW TRIAL ON
INJURY AND DAMAGES